[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-15507
Non-Argument Calendar
_____

D.C. Docket No. 5:15-cr-00032-MHH-SGC-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

CEDRIC DUANE RYANS,

Defendant - Appellant.
_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(September 27, 2017)

Before HULL, MARCUS, and WILLIAM PRYOR, Circuit Judges.

HULL, Circuit Judge:

Defendant Cedric Ryans appeals his convictions for conspiracy to commit

bribery, bribery, and obstruction of justice. Specifically, defendant Ryans

challenges (1) the sufficiency of the evidence for his bribery conviction, (2) the district court's denial of his motion to extend time to file a post-verdict motion for judgment of acquittal, and (3) the constitutionality of the relevant bribery statute, 18 U.S.C. § 666(a)(2).  After thorough review, we affirm.

## I.  FACTUAL BACKGROUND

On July 29, 2014, Officer Tory Green of the Huntsville, Alabama Police Department, while on traffic patrol, stopped Willie Leggs and searched Leggs's vehicle.  Officer Green found about 85 grams, or three ounces, of cocaine.  Officer Green detained Leggs and then contacted Sergeant Lucas with the Strategic Counter Drug Team ("STAC") unit.[1]

Officer Lucas arrived at the scene and spoke with Leggs, who indicated that he would be willing to cooperate in order to avoid having charges brought against him.  Officer Green then transported Leggs to the STAC office.  Leggs was interviewed at the STAC office, was not arrested, but was released in hopes that he would cooperate with STAC to catch criminals higher up in the chain of command of the drug organizations.[2]

---

[1]The STAC team receives federal funding, including $141,743 from October 1, 2012 through September 30, 2013 and $130,699 from October 1, 2013 through September 30, 2014.  As a practical matter, the City of Huntsville fronts the funds to the police department, and the federal grant money is used to reimburse the city.  Thus, for the year 2014, the City of Huntsville received over $10,000 in federal funds for the benefit of the police department.

[2]Over a month later on September 8, 2014, STAC arrested Leggs on a cocaine trafficking charge stemming from the July 29 traffic stop.  Leggs faced penalties of a three-year mandatory

Leggs was close friends with defendant Ryans. Leggs even had a key to defendant Ryans's house. Defendant Ryans allowed Leggs to keep money and drugs in Ryans's house with the money kept in various locations, such as in a closet, shoeboxes, or napkin boxes, so that if the police walked in the house they would not find it. The amount of money varied from $60,000 to $90,000. Leggs identified defendant Ryans in the courtroom.

On July 30, 2014, Leggs went to defendant Ryans's house, and they discussed the police stopping Leggs the previous night. Defendant Ryans suggested that he had a friend in the Huntsville Police Department with whom he would talk and see what the friend could do. Leggs left defendant Ryans's house, but two hours later Ryans called Leggs and asked Leggs to return. When Leggs returned, defendant Ryans told Leggs that he had talked to the police officer friend and that the officer could make Leggs's problem "disappear." Leggs responded that he was willing to do whatever it would take to make the case disappear and stated: "You can't put a cost on freedom."

That same day (July 30), defendant Ryans sent a text message to his contact, police officer Lewis Hall, who was at that time still a police officer with the City of Huntsville. On July 31, 2014, Officer Hall met with defendant Ryans in person. Defendant Ryans asked Officer Hall about the officer—Officer Green, also with

_____

prison sentence and a fine. Leggs also had a previous federal conviction, was on supervised release at the time of his arrest, and faced revocation of that supervised release.

the City—who had arrested Leggs and if Hall thought that Officer Green would "take a little money to help get the charges dropped." Defendant Ryans told Officer Hall that Leggs would be willing to pay $5,000 and that Ryans was keeping drugs and money for Leggs.

That same morning Leggs again returned to defendant Ryans's house. At that time defendant Ryans told Leggs that it would cost $15,000 to $18,000 to get rid of the case. Leggs agreed to pay the money, "whatever it cost." Defendant Ryans offered to act as a go between for Leggs and Officer Hall so that the two never had to meet. At this point, defendant Ryans had never mentioned the officer's name to Leggs. The money for the bribe was to come out of Leggs's stash at defendant Ryans's house.

Defendant Ryans later told Leggs that on July 31, 2014 he gave $5,000 to Officer Hall. Defendant Ryans also informed Leggs that he would need to make three more payments out of the money stash. On two more occasions defendant Ryans would tell Leggs that Ryans needed to make an additional $5,000 payment in order to bribe the other police officers, and Leggs agreed to make the payments.

On that same day, July 31, 2014, Officer Hall contacted Officer Green to meet up. Officers Hall and Green met up outside the precinct early that afternoon. Officer Hall asked Officer Green to take off the recording device he wears with his

4

uniform.  Officer Hall then asked Officer Green about his "good lick," or arrest, of Leggs.

Officer Hall told Officer Green that Hall's "boy" knows Leggs and "could give [Green] five stacks."  One "stack" is $1,000, and "five stacks" is $5,000. Officer Green at first thought Officer Hall was joking, but Hall then said "you don't hear me.  Five stacks.  That's a lot of cheese."  Officer Hall explained that he wanted Officer Green to say that his search of Leggs's vehicle was illegal because that would get the case against Leggs thrown out.

According to Officer Green, he told Officer Hall that he needed to think about it, but, instead, Green reported the conversation to his superiors, Sergeant Lucas, and two Internal Affairs investigators.  Officer Green and the Internal Affairs investigators developed a plan to investigate Officer Hall.

Officer Hall testified that Officer Green agreed to accept the bribe when they met at the precinct because "he needed the money."  Officer Hall reported back to defendant Ryans that Officer Green was "good to go," "would do it," and "would get back with" Hall about it.

Later that night, Officer Hall met up with Officer Green at Green's part-time job.  Hall asked if Officer Green was "wearing a wire," to which Green responded that he was not.  Officer Green was, in fact, wearing a wire.  Officer Hall told Officer Green that to get paid Green needed to contact Sergeant Lucas and, if

5

necessary, the district attorney to let them know that Green had violated Leggs's rights. Officer Hall reported back to defendant Ryans about their meeting, telling Ryans that "everything was good to go" and that they were "just waiting on [Ryans] to get the money."

A few days later, Officer Hall called Officer Green, and Green informed Hall that he had contacted Sergeant Lucas and that Lucas was very upset with Green about his "illegal" search of Leggs's car. In reality, none of that was true, and Officer Green was only furthering the investigation into Officer Hall.

At some point in early August, Officer Hall met with defendant Ryans, who gave him $6,000 to bribe Officer Green.

On August 11, 2014, Officer Green again told Officer Hall that he had cooperated and contacted Sergeant Lucas. In response, Officer Hall stated that another officer got to Leggs first, meaning that Officer Green would not get paid. Officer Hall said that his "boy" was still going to try to get a "stack" for Officer Green. Officer Green encouraged this, suggesting that he "need[ed] something" and that "if it was not for [him], none of this would be happening, anyway." Officer Hall responded that he would get Officer Green some money even if he had to pay it out of his own pocket.

The next day, August 12, 2014, Officer Green sent a text message to Officer Hall about needing the money before an upcoming meeting. Officer Hall called

back and was upset about Officer Green putting that sort of information in a text message because someone could be watching their phones.

Later that night, Officer Green met up with Officer Hall after briefing and preparing the sting operation with the investigators.  Officer Hall handed Officer Green a stack of $20 bills in a rubber band and said "this [is] out of my own pocket."  Officer Hall gave Officer Green $1,000 out of the $6,000 that defendant Ryans had given him.

Officer Hall later told defendant Ryans that Officer Green had said that Leggs was a drug dealer and could come up with more money for a bribe. Defendant Ryans sent a text message to Officer Hall explaining that Leggs only had $2,000 more.

On August 24, 2014, Leggs made one final payment after exchanging text messages with defendant Ryans.  Defendant Ryans said Leggs owed Officer Hall—this time Ryans used the name Hall—the remaining $3,000 of the $18,000 Leggs initially had agreed to pay.  Leggs did not have $3,000 but came up with $2,000, which he gave to defendant Ryans.  Defendant Ryans met with Officer Hall that night and gave Hall the $2,000.  Officer Hall kept the money.

In sum, defendant Ryans gave Officer Hall $8,000, but Hall gave Officer Green only $1,000.  Officer Hall spent the remaining money on fixing his cars.

7

On September 2, 2014, the police arrested Leggs for trafficking cocaine in connection with the July 29, 2014 traffic stop that started all of this.[3]  In the present case, Leggs pled guilty to conspiracy to commit bribery.

In December 2014, agents arrested Officer Hall on charges of bribery, conspiracy, obstruction, and filing a false statement.  Officer Hall initially told the agents that he received only a $1,000 bribe.  Eventually, Officer Hall admitted that he had received $8,000.  Officer Hall pled guilty to conspiracy to commit bribery.

This appeal involves only the charges against defendant Ryans.

## II.  PROCEDURAL HISTORY

Specifically, on February 27, 2015, a federal grand jury indicted defendant Ryans on charges of (1) conspiracy to commit bribery, in violation of 18 U.S.C. § 371, ("Count One"); (2) aiding and abetting bribery, in violation of 18 U.S.C. § 666(a)(2) and 2, ("Count Two"); and (3) aiding and abetting the obstruction of justice, in violation of 18 U.S.C. § 1512(b)(3) and 2, ("Count Three").

On December 10, 2015, after a four-day trial, the jury found defendant Ryans guilty of all three counts.

At the close of the government's case, defendant Ryans moved for a judgment of acquittal on all counts.  Defendant Ryans argued that the testimony of the convicted felons "was incredible as a matter of law" and that the government

---

[3]Leggs also testified that he paid an additional $15,000 to another STAC agent who was pursuing Leggs and Leggs's son.

"failed to establish a prima facie case as to each and every count."  The district court denied the motion, explaining that credibility determinations are typically left for the jury.

On December 17, 2015, seven days after the jury verdict, defendant Ryans moved for an extension of time of 45 days from December 17 to file a post-judgment motion for judgment of acquittal or new trial.  Defendant Ryans stated that he needed the trial transcripts to prepare his motion.  The district court granted that motion in a docket order, which made defendant Ryans's motion now due on February 1, 2016.

On February 12, 2016, the trial transcripts were put on the district court's docket.  Nonetheless, for five months from February 12 to July 15, counsel for defendant Ryans did not file a motion for judgment of acquittal.

On July 15, 2016 during a telephone conference, counsel for defendant Ryans orally requested an additional 30 days to file a motion for judgment of acquittal, and the district court rejected that request.

On July 21, 2016, defendant Ryans then filed a written motion for reconsideration of the district court's oral denial of Ryans's request for an additional 30-day extension of time to file a motion for judgment of acquittal.  In the motion, defendant Ryans's counsel explained that she (1) had been busy with another complex federal bankruptcy trial with an obstructionist client; (2) had

9

needed to wait until the trial record in this case was received to work on the motion

for acquittal; and (3) had no access to client files from April 28, 2016 until May

18, 2016. That same day, defendant Ryans's counsel also filed a written motion

for judgment of acquittal of Ryans under Federal Rule of Criminal Procedure 29.

The district court denied both motions without explanation.

On August 1, 2016, the district court sentenced defendant Ryans to a 30-

month prison term on each of Counts One through Three, to be served

concurrently. Defendant Ryans timely appealed.

## III.   DISCUSSION

### A.    Denial of the Motions for Extension of Time and Untimely Motion for Judgment of Acquittal

We construe defendant Ryans's brief as challenging the district court's

denial of all three of his motions: (1) his July 15, 2016 oral motion for extension of

time, (2) his July 21, 2016 motion for reconsideration of the denial of his oral

motion for extension of time, and (3) his July 21, 2016 motion for judgment of

acquittal.[4] The district court did not abuse its discretion in not granting defendant

Ryans additional time, and his post-trial motion for judgment of acquittal was

untimely. Alternatively, even if we consider the post-trial motion for judgment of

acquittal as timely, that motion fails on the merits as discussed later. Defendant

---

[4]We review the district court's decision on excusable neglect for an abuse of discretion. Advanced Estimating Sys., Inc. v. Riney, 77 F.3d 1322, 1325 (11th Cir. 1996) (per curiam).

10

Ryans thus suffered no prejudice from the district court's denial of any of the three motions.

As to timeliness, a motion for judgment of acquittal is due within 14 days after a guilty verdict. Fed. R. Crim. P. 29(c)(1). Thus, defendant Ryans's motion for judgment of acquittal was initially due on December 24, 2015. The district court granted a 45-day extension (from December 17, 2015) of time to file such a motion, making the motion due on February 1, 2016. See Fed. R. Crim. P. 45(a)(1)(C) (extending the deadline from Sunday to Monday). Defendant Ryans, however, did not even ask the district court for more time until over five months later during a July 15, 2016 telephone conference.

A district court may for "good cause" extend a deadline after the deadline has expired "if the party failed to act because of excusable neglect." Fed. R. Crim. P. 45(b)(1). The determination of excusable neglect "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395, 113 S. Ct. 1489, 1498 (1993). The relevant circumstances include (1) "the danger of prejudice," (2) "the length of the delay and its potential impact on judicial proceedings," (3) "the reason for the delay, including whether it was within the reasonable control of the movant," and (4) "whether the movant acted in good faith." Id.

11

Defendant Ryans has failed to demonstrate that the district court erred by not finding excusable neglect.  None of the first three factors support defendant Ryans's position.  First, there is no prejudice to defendant Ryans as the issues raised in his untimely post-judgment motion for judgment of acquittal are the same as those raised in the remainder of this appeal, such as his challenge to the sufficiency of the evidence to support his convictions.  While counsel did not file a timely post-trial motion for acquittal, counsel did move for an acquittal at the close of the evidence and preserved the sufficiency of the evidence issue.  As discussed later, there is ample evidence to support defendant Ryans's convictions, and thus he cannot show prejudice from counsel's failure to file a timely post-trial motion for judgment of acquittal.  Thus defendant Ryans suffered no prejudice from the denial of his motions for extension of time or his untimely post-trial motion for judgment of acquittal, which, even if timely, would fail on the merits.

Second, the length of the delay was significant—five months after the expiration of an already extended deadline.  Third, defendant Ryans's counsel has not established that the reasons for the delay—another difficult case and the need for trial transcripts—were outside of her reasonable control.  The trial transcripts were available in February 2016, and counsel could have moved for another extension at a much earlier date when it became apparent that her other case would be time consuming.  Even if there is no evidence of bad faith by defendant Ryans,

12

his trial counsel's good faith alone is insufficient in this case to find that the trial court abused its discretion. The district court thus properly denied defendant Ryans's motions for an extension of time.

To the extent defendant Ryans contends that the district court should have addressed his motion for judgment of acquittal because he raised a jurisdictional challenge that would not be time barred, we reject this argument. First, defendant Ryans's motion challenged only the sufficiency of the evidence as to the value of the city's business under 18 U.S.C. § 666(a)(2) and not as to whether the City of Huntsville received $10,000 in federal benefits under § 666(b). See United States v. McLean, 802 F.3d 1228, 1240 (11th Cir. 2015) (describing the § 666(b) receiving federal benefits requirement as the "jurisdictional element"). Defendant Ryans conceded that the evidence established that the City of Huntsville received more than $10,000 in federal benefits, satisfying § 666(b) the jurisdictional element. Second, as discussed below, the evidence at trial was more than sufficient to prove the necessary elements of § 666. The district court thus did not err in denying defendant Ryans's motions for an extension of time or his post-trial motion for judgment of acquittal.

## B.    Sufficiency of the Evidence

18 U.S.C. § 666(a)(2) allows for the imprisonment of whomever:

> corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization

or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more.

18 U.S.C. § 666(a)(2).[5]  In other words, defendant Ryans violated § 666(a)(2) if he (1) gave a City of Huntsville employee anything of value (2) with the corrupt intent to influence or reward them (3) in connection with any business, transaction, or series of transactions of the City of Huntsville involving anything of value of $5,000 or more.  United States v. McNair, 605 F.3d 1152, 1186 (11th Cir. 2010).

Defendant Ryans contends that the evidence was insufficient to prove the third element—that the bribes were "in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more."[6]

The phrase "anything of value" includes "intangibles, such as freedom from jail."  United States v. Townsend, 630 F.3d 1003, 1011 (11th Cir. 2011) (interpreting the phrase "any thing of value" under 18 U.S.C. § 666(a)(1)(B), the companion to § 666(a)(2) that prohibits demanding or soliciting a bribe); United

---

[5]The relevant organization, government, or agency must also receive over $10,000 from the federal government in any one year period.  18 U.S.C. § 666(b).  Here, testimony at trial clearly showed that the City of Huntsville and the STAC unit received over $100,000 in grants from the federal government and that Officer Green was an employee of the City of Huntsville.

[6]We review the sufficiency of the evidence de novo, resolving all reasonable inferences in favor of the jury's verdict.  United States v. Medina, 485 F.3d 1291, 1296 (11th Cir. 2007). The evidence must be sufficient for a reasonable jury to find that the government has proven the defendant guilty beyond a reasonable doubt.  Id. at 1296-97.

14

States v. Moore, 525 F.3d 1033, 1048 (11th Cir. 2008) (explaining that "this Court has held that the term 'thing of value' unambiguously covers intangible considerations" for other federal bribery statutes); see also McNair, 605 F.3d at 1186 n.38 (treating the $5,000 value requirement in § 666(a)(1)(B) and § 666(a)(2) the same). We conclude that under § 666(a)(2) "anything of value" includes intangibles. In this case, the intangible thing of value was Leggs's freedom from jail.

To determine the value of an intangible obtained, or sought, through bribery, this Court uses a "market approach," in which "the value of an intangible in the black market of corruption is set at the monetary value of what a willing bribe-giver gives and what a willing bribe-taker takes in exchange for the intangible." Townsend, 630 F.3d at 1012; see also McNair, 605 F.3d at 1186 n.38 ("Where the bribe-giver receives an intangible benefit, some courts have used the bribe amount as a proxy to stand for the value of the business or transaction.").

The district court did not err in denying defendant Ryans's motion for judgment of acquittal because there was sufficient evidence for a reasonable jury to conclude beyond a reasonable doubt that Ryans aided and abetted Leggs and Officer Hall's offering a police officer (Officer Green) a bribe in connection with anything of value of $5,000 or more. Leggs, the bribe-giver, told Ryans that he could not put a price on his freedom. Leggs even agreed to a total bribe of

$18,000, which indicates how much he values the intangible benefit of staying out of prison. In any event, Ryans paid Officer Hall $8,000, which is itself over the $5,000 threshold. The fact that Officer Green actually received only $1,000 is immaterial to determining the market value of the intangible benefit.

## C.    Constitutionality of § 666(a)(2)

Defendant Ryans contends that § 666(a)(2) is unconstitutionally vague and exceeds Congress's powers under the Necessary and Proper Clause of the Constitution. Here, we review defendant Ryans's challenge to the constitutionality of § 666(a)(2) for plain error because he raises it for the first time on appeal. United States v. Wright, 607 F.3d 708, 715 (11th Cir. 2010).[7] There can be no plain error "[w]ithout precedent directly resolving" the claim. United States v. Humphrey, 164 F.3d 585, 588 (11th Cir. 1999).

Defendant Ryans has neither provided any explanation for how § 666(a)(2) is vague nor cited any controlling precedent addressing § 666(a)(2). Indeed, this Court previously rejected an as-applied vagueness challenge to the materially similar § 666(a)(1)(B). United States v. Nelson, 712 F.3d 498, 508 (11th Cir. 2013). A criminal statute is only void for vagueness "if it fails to provide people of

---

[7]Plain error occurs where "there is: '(1) error, (2) that is plain, and (3) that affects substantial rights.'" United States v. Shelton, 400 F.3d 1325, 1329 (11th Cir. 2005) (quoting United States v. Rodriguez, 398 F.3d 1291, 1297 (11th Cir. 2005)). If these three conditions are met, an appellate court then has "discretion to notice a forfeited error" if "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (quoting Rodriguez, 398 F.3d at 1297).

ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." United States v. Wayerski, 624 F.3d 1342, 1347 (11th Cir. 2010) (internal quotation marks omitted). Here, a person of ordinary intelligence would understand that § 666(a)(2) prohibits bribing a police officer to lie about an investigation and a search.

Defendant Ryans does not cite any binding precedent directly resolving whether § 666(a)(2) exceeds the scope of Congress's constitutional authority, instead relying on a concurring Supreme Court opinion and a district court case from another circuit. On that basis alone we would find no plain error occurred.

More significantly, however, the Supreme Court has directly addressed the constitutional challenge raised by defendant Ryans and rejected it. Sabri v. United States, 541 U.S. 600, 124 S. Ct. 1941 (2004). In Sabri, the Supreme Court upheld § 666(a)(2) as a valid exercise of Congress's authority under the Spending Clause and the Necessary and Proper Clause. Id. at 605-607, 124 S. Ct. at 1945-47. Justice Thomas's dissent in that case does not permit us to ignore binding Supreme Court precedent or to find plain error. Defendant Ryans's constitutional challenge under those clauses therefore fails.

## IV.    CONCLUSION

Based on the foregoing reasons, we affirm defendant Ryans's convictions.

**AFFIRMED**.

17